UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| JACY GAMBLE, *for herself and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>PENNEY OPCO LLC; and DOE DEFENDANTS *1 to 5*,<br><br>    Defendants. | Case No. 6:24-cv-01414-MTK<br><br>**OPINION AND ORDER** |

**KASUBHAI,** United States District Judge:

Plaintiff Jacy Gamble ("Plaintiff") brings this action alleging that Defendant Penney Opco, LLC ("Defendant") violated Oregon's Unlawful Trade Practices Act by conducting "a massive false discount advertising scheme across nearly all of its products on both its website and in its retail stores." Compl. ¶ 2; ECF No. 1. Plaintiff alleges that Defendant "advertises perpetual or near-perpetual discounts from a false higher reference price in order to trick its customers into believing the advertised 'sale' price represents a special bargain from [Defendant's] usual and regular prices." Compl. ¶ 16. Plaintiff brings this action on behalf of a proposed class of customers[1].

---

[1] The proposed class consists of "[a]ll persons who, while in Oregon, within the applicable statute of limitations period, purchased from [Defendant] one or more products advertised at a discount." Compl. ¶ 90.

Page 1 — OPINION AND ORDER

Pointing to two agreements to arbitrate the parties allegedly entered, Defendant moves to stay this action pending arbitration. Mot. Compel Arbitration; ECF No. 17. Plaintiff argues (1) she never entered into the first agreement and (2) the second agreement does not cover the dispute at issue. The Court agrees with Plaintiff. Defendant's Motion to Compel Arbitration (ECF No. 17) is DENIED.

## BACKGROUND

The facts of Defendant's allegedly deceptive advertising campaign are not relevant to the pending motion to stay this action pending arbitration. Regarding that motion, the parties agree that two arbitration agreements are at issue. The first arbitration agreement at issue stems from the "Terms and Conditions" relating to the use of Defendant's website. Those Terms of Use provide:

> **Any dispute or claim arising out of or relating in any way to your use of this Website, to any purchases made through this Website, or to the sale of any products or services sold or distributed by [Defendant] on this Website, will be resolved by <u>binding arbitration</u>, rather than in court**[.]

Cunningham Decl. ¶ 6 (emphasis in original).

The parties agree that if Plaintiff entered into the agreement, it applies to the dispute at issue. The parties disagree, however, as to whether Plaintiff entered into the agreement merely by using Defendant's website.

The second agreement stems from Defendant's Rewards Program. In contrast to the Terms and Use agreement, the parties agree that the Rewards Program contains an arbitration

/ / /

/ / /

/ / /

Page 2 — OPINION AND ORDER

agreement but disagree on whether that agreement applies to this dispute.[2] The Rewards Program Terms and Conditions provides:

> **Any dispute or claim arising out of or relating in any way to a Member's participation in the Program, including, without limitation, the issuance of Points, the issuance or redemption of Rewards, or the receipt of any Program benefits, will be resolved by binding arbitration, rather than in court**[.]

Cunningham Decl. ¶ 11 (emphasis in original).

Plaintiff argues that even if she is bound by that agreement, the agreement does not apply to this dispute as Plaintiff's claims do not arise from, or relate to, Defendant's Rewards Program. Given the above, there are only three disputes regarding Defendant's motion:

1. Did Plaintiff agree to the Terms and Conditions regarding use of Defendant's website?
2. Does the Court or an arbitrator determine whether the dispute at issue falls under the Reward Program arbitration agreement?
3. Assuming the Court may resolve the scope of the Reward Program arbitration agreement, does the agreement apply to the dispute at issue?

## STANDARDS

A motion to compel arbitration is appropriately raised pursuant to Rule 12(b)(1). *See Geographic Expeditions. Inc. v. Estate of Lhotka ex rel. Lhotka,* 599 F.3d 1102, 1104 (9th Cir. 2010). In considering a Rule 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes. *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir.2009).

The Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA"), "mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. The basic role for courts under the FAA is to determine '(1) whether a valid

---

[2] Although Plaintiff does not concede that she is subject to the Rewards Program arbitration agreement, the parties agree that (1) Plaintiff joined Defendant's Rewards Program and (2) the Rewards Program contains an arbitration agreement. For the purpose of resolving the pending motion, the Court assumes, without deciding, that Plaintiff agreed to be bound by that arbitration agreement.

agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Kilgore v. KeyBank, Nat'l Assoc.*, 718 F.3d 1052, 1058 (9th Cir. 2013) (internal citations omitted). The FAA states that written agreements to arbitrate arising out of transactions involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts "rigorously enforce" agreements to arbitrate. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Additionally, courts strongly favor arbitration and broadly construe arbitration clauses. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir.1999) ("The standard for demonstrating arbitrability is not high"). If the issue is referable to arbitration under the agreement, then the court must direct the issue to arbitration and stay the trial. 9 U.S.C. § 3.

## DISCUSSION

I. **Did Plaintiff agree to the Terms and Conditions regarding use of Defendant's website?**

Defendant argues that by using Defendant's website, Plaintiff necessarily agreed to the website's Terms of Use. "Customers who use JCPenny.com are necessarily presented with a 'Terms and Conditions' link at the bottom of each page on the site, including the home page, every product page, the shopping cart page, and the checkout page." Cunningham Decl. ¶ 6; ECF No. 17–2. A customer today who clicks on the Terms and Conditions link is taken to the Terms and Conditions page. *Id.* That page contains the Terms of Use of Defendant's webpage.[3] A customer who scrolls through the first four pages of the Terms of Use will come to the section titled **Arbitration**. That agreement provides:

---

[3] As outlined below, although Cunningham's declaration describes how the website appears today, the relevant portions of the website operated differently when Plaintiff made her purchase in August 2023. At that time, one had to click on the "Legal" link, located next to the "Terms and Conditions" link, to reach the website's Terms of Use.

> **Any dispute or claim arising out of or relating in any way to your use of this Website, to any purchases made through this Website, or to the sale of any products or services sold or distributed by JCPenney on this Website, will be resolved by <u>binding arbitration</u>, rather than in court**[.]"

Cunningham Decl. Ex. A, 5 (emphasis in original).

Defendant provides no evidence indicating that Plaintiff saw, let alone clicked on, any link taking her to the website's Terms and Conditions. Therefore, Defendant must demonstrate that merely by using the website, Plaintiff was on inquiry notice of its Terms of Use and is bound by the arbitration agreement. The Ninth Circuit recently addressed this issue in *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2024). The question presented in *Berman* was: "Under what circumstances can the use of a website bind a consumer to a set of hyperlinked 'terms and conditions' that the consumer never saw or read?" *Id.* at 853. As Defendant does here, the *Berman* defendants "moved to compel arbitration, arguing that plaintiffs' use of the websites signified their agreement to the mandatory arbitration provision found in the hyperlinked terms and conditions." *Id.*

In contrast to a "clickwrap" agreement, which presents website users with a box which the user may choose to affirmatively check and state "I agree," a "browsewrap" agreement "offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id*. at 856. "Courts are more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Id.* Where, as here, a Defendant provides no evidence demonstrating that the Plaintiff had actual notice of the agreement, "an enforceable contract will be found based on inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some

action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*

Defendant argues that although Plaintiff never clicked a button or checked a box indicating that she agreed to the website's Terms and Conditions, "Plaintiff had inquiry notice of the Website Terms of Use based on her longstanding and ongoing relationship with JCPenney[.]" Reply 5; ECF No. 22. In support, Defendant argues that "broweswrap agreements are not categorically invalid under Oregon law[.]" *Id.* at 4. The question, however, is not whether browsewrap agreements are categorically invalid, but whether the agreement at issue provided reasonably conspicuous notice and Plaintiff "unambiguously manifest[ed]" assent to those terms. *Berman*, 30 F.4th at 856; *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014).

Again, there is no evidence that Plaintiff ever clicked on any hyperlink taking her to Defendant's Terms and Conditions. Even if Plaintiff had clicked on the Terms and Conditions link when she made the purchase, Defendant concedes in its Reply that Plaintiff would have been redirected not to the Terms of Use quoted above (which contains the arbitration agreement), but to the SMS Terms and Conditions. While that webpage describes an agreement allowing Defendant to send promotional text messages to users, it does not contain any arbitration agreement, let alone the arbitration agreement quoted above. Hattis Decl. ¶¶ 8–12, Ex. B; ECF No. 20–2. Instead, Defendant concedes (in its Reply) that at the time of her purchase, Plaintiff would have had to click the "Legal" link, which would have redirected Plaintiff to Defendant's Terms of Use. The "Legal" link, however, much like the Terms and Conditions link, is the opposite of reasonably conspicuous. One looking to purchase something from Defendant's website in August 2023 would arrive here:

Page 6 — OPINION AND ORDER



After scrolling down through three similar pages, one would arrive at a page like the one below. To assist the reader in locating the links important to the outcome here, the Court inserted a blue arrow pointing to the Terms and Conditions link, and a red arrow pointing to the Legal link.

Page 7 — OPINION AND ORDER



In assessing the "visual conspicuousness" of a link purportedly placing an internet user on inquiry notice of contractual terms, courts analyze the size, color, and location of the hyperlink in relation to the overall webpage. *Godun v. JustAnswer LLC*, 135 F.4th 699, 709–10

(9th Cir. Apr. 15, 2025). When making a determination regarding the relative conspicuousness of a specific hyperlink, "[a] hefty dose of common sense goes a long way."[4] *Id.* at 710.

Neither the Terms and Conditions link nor the Legal link are conspicuous when viewed in the context of the entire webpage. The links are buried at the bottom of a page essentially overridden with an abundance of other links of the same size and color. Although some of the dozens of links are underlined—suggesting to the user that the link is a hyperlink—neither relevant link is underlined. Additionally, the user's eye is driven not to the bottom of the page, where these links are essentially lost amongst a plethora of other links, but to the top of the page. The top of the page, in contrast to the link-littered bottom, has four large, red circles advertising different services (like same–day pickup and the Rewards Program). The red circles are set off against the white background, drawing the user's eyes to that portion of the webpage. Ordinary website users expect that hyperlinks with "important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." Berman, 30 F. 4th at 857. In short, neither the Legal link nor the Terms & Conditions link provide "*reasonably* conspicuous notice of the terms to which the consumer will be bound." *Godun*, 135 F.4th at 709 (quoting *Berman*, 30 F.4th at 856).

Additionally, that Plaintiff used Defendant's website on multiple occasions does not mean that she had inquiry notice of the arbitration terms. "Together with the visual prominence of an advisal, we also consider under the first step the full context of the transaction, such as whether the type of transaction contemplates entering into a continuing, forward–looking relationship that would be governed by terms and conditions." *Id.* at 710 (cleaned up). Although

---

[4] Although this case deals with Oregon law and *Godun* dealt with California law, the Ninth Circuit has "consistently stated that no differences exist in the law of the different states as to internet contract formation." *Godun*, 135 F.4th at 708.

Plaintiff used the website to shop on multiple occasions, nothing in that relationship indicates a user would believe they entered a "continuous relationship" with Defendant merely by using the website. *Id.* (examples indicating a "continuing relationship" include creating an account requiring completion of a registration process, entering a free trial period, and downloading an application to their phone).

      Finally, nothing in this record indicates that Plaintiff took any action—such as checking a box—indicating that she agreed to the arbitration terms. Instead, Plaintiff simply shopped on a website that had Terms and Connections available via clicking on a link that was essentially buried under dozens of other similar looking links. The Court is unable to find, and Defendant fails to point to, any case in any jurisdiction where a court concluded a website user was on inquiry notice under facts remotely analogous to those present here. Because the relevant links were not "reasonably conspicuous," and because Plaintiff took no affirmative action indicating her unambiguous manifestation of her intent to be bound by the arbitration agreement found in Defendant's Terms and Conditions, she is not bound by that agreement. *Id.* at 709; *Nguyen*, 763 F.3d at 1178–79 ("in keeping with courts' traditional reluctance to enforce browsewrap agreements against individual consumers, we therefore hold that where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.") (internal footnote omitted).

      / / /

      / / /

      / / /

## II.    Does the Court or an arbitrator determine whether the dispute at issue falls under the Reward Program's arbitration agreement?

Generally, once the Court determines that the parties entered into a valid arbitration agreement, the Court must consider "whether the agreement encompasses the dispute at issue."[5] *Kilgore*, 718 F.3d at 1058 (quotations omitted). However, contracting parties may agree that an arbitrator is entitled to make "gateway" issues of arbitrability. *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63 (68–69 (2010). Here, the burden is on the Defendant to present "clear and unmistakable evidence that [the] contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (noting question of arbitrability is "an issue for judicial determination unless the parties clearly and unmistakenly provide otherwise").

The arbitration section of the Rewards Program Terms and Conditions contains an arbitrability provision: "The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Consumer Arbitration Rules." Cunningham Decl. Ex. C, 25. The AAA rules provide that "[t]he arbitrator shall have the power to rule on his or her jurisdiction, any objections with respect to the existence, scope or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Brooks Decl. Ex. 1, 17; ECF No. 17–1. Defendant argues that the language referencing the AAA rules demonstrates the parties clear and unambiguous intention to present the question of arbitrability to the arbitrator in any dispute regarding the Rewards Programs.

The parties agree that in the Ninth Circuit, language in an arbitration agreement referencing the AAA rules could indicate that the parties agreed to arbitrate arbitrability. *See*

---

[5] As noted above, the Court assumes, without deciding, that Plaintiff agreed to the arbitration agreement contained in Defendant's Reward Program Terms and Conditions when Plaintiff chose to join the Rewards Program.

*Brennan*, 796 F.3d at 1130; *see also Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013). Indeed, the Ninth Circuit agrees with "[v]irtually every circuit" that incorporation of arbitration rules "constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130 (quoting *Oracle America*, 724 F.3d at 1074). *Brennan* and *Oracle America*, however, explicitly limited those holdings to arbitration agreements "between sophisticated parties." *Brennan*, 796 F.3d at 1131 (quoting *Oracle America*, 724 F.3d at 1075). The only evidence as to Plaintiff's sophistication or lack thereof is that Plaintiff is "an ordinary consumer" and "an unsophisticated layperson who is untrained in the law." Gamble Decl. ¶ 2; ECF No. 20–1.

Judge Beckerman recently issued an opinion detailing an arbitration agreement containing a reference to the same AAA rules at issue here. *Escobar v. Nat'l Maintenance Contractors, LLC*, No. 3:20-cv-01695-SB, 2021 WL 3572652 at *7–8 (D. Or. Aug. 12, 2021), *aff'd in part, rev'd in part*, No. 21-35765, 2022 WL 17830001 (9th Cir. Dec. 21, 2022). As is the case here, *Escobar* involved unsophisticated Plaintiffs. Judge Beckerman noted the split amongst district courts within the Ninth Circuit regarding whether "*Brennan* applies to contracts involving at least one unsophisticated party." *Id.* at *8 (listing cases). Judge Beckerman agreed with those district courts who concluded that *Brennan* did not apply to cases with an unsophisticated party. *Id.* ("That the Arbitration Agreement here cross referenced the AAA Rules generally, including the rule on an arbitrator's jurisdiction, is hardly 'clear and unmistakable' evidence of who decides arbitrability from the standpoint of relatively unsophisticated laypersons."). This Court finds *Escobar*, and the cases relied on there, persuasive.

*Eiess v. USAA Fed. Savings Bank*, No. 19-cv-00108-EMC, 404 F. Supp. 3d 1240, 1252–54 (N.D. Cal. Aug. 23, 2019) is instructive. Noting the post-*Brennan* split amongst district courts

in the Ninth Circuit regarding incorporation by reference to arbitration rules with respect to the arbitrability issue, the *Eiess* court noted that "the majority of the lower courts in the Ninth Circuit have 'held that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party.'" *Id*. at 1252–53 (quoting *Ingalls v. Spotify USA, Inc.*, No. 16-03533-WHA, 2016 WL 6679561, at *4 (N.D. Cal. Nov. 14, 2016) (listing cases). The *Eiess* court continued:

> The Court agrees with the majority of district courts in the Ninth Circuit. Although incorporation by reference may fairly be deemed a clear and unmistakable delegation where there are sophisticated parties, a different result may obtain where one party is unsophisticated. For an unsophisticated plaintiff to discover she had agreed to delegate gateway questions of arbitrability, she would need to locate the arbitration rules at issue, find and read the relevant rules governing delegation, and then understand the importance of a specific rule granting the arbitrator jurisdiction over questions of validity—a question the Supreme Court itself has deemed "rather arcane."

*Id.* at 1253.

This Court agrees. Plaintiff is "an unsophisticated layperson who is untrained in the law." Gamble Decl. ¶ 2. Even if Plaintiff happened to locate the AAA rules, she would be met with a rather dense, 38–page rulebook. Brooks Decl. Ex. 1. Assuming that Plaintiff was lucky enough to make it to page 17, she would read rule 14, titled "Jurisdiction:"

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

Brooks Decl. Ex. 1, 17.

Even if Plaintiff made it this far, she would have little reason to believe that although rule 14 granted the arbitrator with the authority to rule on the issue of arbitrability, it silently removed that same authority from the district court. Going further, this unsophisticated Plaintiff would have even less of a reason to conclude that rule 14 could one day be used by the Defendant as "clear and unmistakable" evidence that the Plaintiff agreed to allow the arbitrator—and only the

arbitrator—to resolve questions of whether a future dispute fell under the Rewards Program Terms and Conditions agreement to arbitrate. The Court concludes that under the fact present here, where the evidence demonstrates that Plaintiff is an unsophisticated party, the arbitration agreement's reference to the AAA rules did not clearly and unmistakenly delegate questions of arbitrability to the arbitrator.[6]

### III. Does the Reward Program's arbitration agreement cover the dispute at issue?

The Rewards Program Terms and Conditions provided:

> **Any dispute or claim arising out of or relating in any way to a Member's participation in the Program, including, without limitation, the issuance of Points, the issuance or redemption of Rewards, or the receipt of any Program benefits, will be resolved by binding arbitration, rather than in court**[.]

Cunningham Decl. ¶ 11 (emphasis in original).

In 2016, a Plaintiff in Kansas filed a class action against Defendant alleging, as Plaintiff alleges here, that Defendant "used a False Former Price Advertising Scheme." *Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1053 (10th Cir. 2018) (quotations omitted). As is the case here, Defendant moved to compel arbitration, arguing that the Rewards Program Terms and Conditions compelled arbitration. Although Defendant has since slightly changed the language of its Reward Program arbitration agreement, the agreement there was substantially similar to the agreement here and provided that the parties "**each agree that any dispute, claim, or controversy ("Claim") arising from or relating to this Agreement or [Plaintiff's J.C. Penney] Rewards Membership will be resolved by binding arbitration conducted in the State of Texas (Collin County).**" *Id.* at 1055 (emphasis in original).

---

[6] *Patrick v. Running Warehouse, LLC*, 93 F. 4th 468 (9th Cir. 2024), relied on by Defendant, is not on point. There, "Plaintiffs offered no evidence concerning their sophistication or lack thereof." *Id.* at 481.

In a published opinion, the Tenth Circuit first noted that "arising from or relating to" language was "broad" language that "creates a presumption in favor of arbitrability." *Id.* at 1059. However, the court noted that it "still must look at the parties' intent." *Id.* The court's analysis, while not binding, is certainly persuasive as it involves a nearly identical dispute:

> And, applying a "plain grammatical meaning" of the contract to the facts of this case, it appears the parties did not intend to have facts like those alleged in Cavlovic's complaint to fall within the 2014 Rewards Program agreement's arbitration provision. In "plain language," Cavlovic and J.C. Penney agreed to arbitrate disputes that "arise from or relate to" the Rewards Program. One can imagine many matters that would fall within that category. For instance, the parties likely agreed to arbitrate a disagreement about whether Cavlovic was receiving an adequate number of Rewards Points, or whether J.C. Penney was giving Cavlovic the proper amount of store credit for her Rewards Points.
>
> Yet, a plain reading of the arbitration provision does not support the conclusion that Cavlovic and J.C. Penney also agreed to arbitrate disputes about purchases Cavlovic made at J.C. Penney on which she happened to earn J.C. Penney Rewards Points. The complaint's allegations of fraudulent advertising do not "arise from" the Rewards Program or the amount of Rewards Points Cavlovic received for purchases. The complaint's allegations arise from J.C. Penney's alleged practice of falsely inflating their original prices, only to subsequently mark the prices back down to leave an impression of a deep discount.
>
> J.C. Penney argues Cavlovic's purchase of the earrings was "related to" the Rewards Program, in that after Cavlovic purchased the earrings, J.C. Penney awarded her 158 Rewards Points. But, as a Texas appellate court determined in declining to compel arbitration, it is difficult to "see that this is a claim 'arising out of or relating to' the contract" because even if the parties "honored their contractual obligations in every respect" under the Rewards Program agreement, the contractual compliance would not affect Cavlovic's allegations. In other words, "with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship."
>
> Therefore, the mere existence of the Rewards Program agreement is not itself sufficient to conclude that Cavlovic's allegations of deceptive advertising arise from or relate to that contract. We conclude that the district court did not err.

*Id.* at 1060 (internal citations omitted) (cleaned up).

Here, Plaintiff's claims do not arise out of, or relate in any way, to her membership in Defendant's Rewards Program. And by including specific examples of disputes

that may be subject to the arbitration clause—i.e., "the issuance of Points, the issuance or redemption of Rewards, or the receipt of any Program benefits"—the arbitration agreement here appears narrower than that analyzed in *Cavlovic*. Finally, Defendant certainly knew how to draft a broad arbitration agreement. As discussed above, Defendant's general Terms of Use provide:

> **Any dispute or claim arising out of or relating in any way to your use of this Website, to any purchases made through this Website, or to the sale of any products or services sold or distributed by [Defendant] on this Website, will be resolved by <u>binding arbitration</u>, rather than in court**[.]

Cunningham Decl. ¶ 6 (emphasis in original).

In stark contrast, the Rewards Program contained much narrower language:

> **Any dispute or claim arising out of or relating in any way to a Member's participation in the Program, including, without limitation, the issuance of Points, the issuance or redemption of Rewards, or the receipt of any Program benefits, will be resolved by binding arbitration, rather than in court**[.]

Cunningham Decl. ¶ 11 (emphasis in original).

As Plaintiff's claims have nothing to do with her membership in Defendant's Rewards Program, she did not agree to arbitrate her claims.

## CONCLUSION

For the reasons above, Defendant's Motion to Compel Arbitration and Stay Proceedings (ECF No. 17) is DENIED.

DATED this <u>1st</u> day of July 2025.

s/ Mustafa T. Kasubhai<br>
MUSTAFA T. KASUBHAI (He / Him)<br>
United States District Judge